WATROUS *v.* KENYON.

Mortgages—Discharge—Assignments—Fraud—Evidence.
On a bill to set aside the discharge and assignment of certain mortgages on the ground of fraud, evidence examined, and *held,* not to sustain the allegation of the bill, and to support a finding that complainant had understandingly executed said discharge and assignment, and that the mortgages discharged were duly paid.

Appeal from Eaton; Smith, J. Submitted January 20, 1909. (Docket No. 137.) Decided April 24, 1909.

Bill by Mary Elizabeth Watrous against Levi Kenyon and another to set aside the discharge and assignment of certain mortgages. From a decree dismissing the bill, complainant appeals. Affirmed.

*Kirschman & Kline* and *Huggett & McPeek,* for complainant.

*Frank A. Dean,* for defendants.

*R. J. Kelley* ( *Huggett & McPeek* and *Kirschman & Kline,* of counsel ), for appellant.

*Arthur Kidder* ( *Frank A. Dean* and *Garry C. Fox,* of counsel ), for defendants.

Blair, C. J. The bill of complaint in this suit was filed to set aside as fraudulent two discharges and one assignment of certain mortgages, and for an accounting and foreclosure as to two of the mortgages. Prior to the 14th of September, 1904, the complainant was the owner of three mortgages: One executed by the defendants for $500, on March 12, 1901, due March 12, 1906; one executed by defendants on September 3, 1901, for $1,250, payable September 3, 1908; one executed by Joseph W.

Yourex April 10, 1901, for $900, payable April 10, 1906. The mortgage for $500 covered the north 25 acres of the west fractional quarter of the northwest quarter of section 6, in Bellevue township, Eaton county, and the money was borrowed by Kenyon to pay off a prior mortgage. The $1,250 mortgage covered the whole of said fractional quarter of the northwest quarter, and the money was used in part to purchase an additional 20 acres of land.

The gist of complainant's cause of action is set forth in her bill of complaint, as follows:

"Your oratrix further shows unto the court that she is a widow, and is 65 years old, and has been of feeble health for several years; that on or prior to the 14th day of September, A. D. 1904, one Joseph W. Yourex, of Maple Grove, Barry County, Mich., was indebted to your oratrix in about the sum of $948; that such indebtedness was secured by a mortgage on land in Barry county; that your oratrix placed said claim in the hands of said defendant Levi Kenyon for collection, and that on the day last aforesaid said Kenyon represented to your oratrix that it was necessary for him to have a power or authority from your oratrix to collect said claim; that relying upon such statement, and in compliance with such request, your oratrix went with said Kenyon to the office of Horace H. Bidwell, a notary public in the city of Battle Creek, and there signed two or three papers which said Kenyon had caused to be prepared, and represented to your oratrix that they were powers of attorney or authority for him to collect the said Yourex claim; that your oratrix, having left her spectacles at home, could not and did not read said papers, but signed and acknowledged the same, relying upon the representations and statements of said Kenyon.

"Your oratrix further avers that from the said 14th day of September, A. D. 1904, until on or about the 15th day of December, A. D. 1906, she had no intimation or knowledge that the papers so signed by her at said Bidwell's office were anything different from that which said Kenyon represented to her before and at the time of signing; that on or about the 15th day of December, A. D. 1906, your oratrix caused an examination of the records of mortgages to be made in the register of deed's office for the county of Eaton, and discovered for the first time that

the papers so signed by her on the 14th day of September, A. D. 1904, were discharges of the mortgage hereinbefore set forth, and another mortgage hereinafter mentioned which your oratrix owned and held against the defendants herein.

"Your oratrix further avers that such discharges of mortgages were caused to be recorded by said Kenyon in the office of the register of deeds for said county of Eaton on the 15th day of May, A. D. 1905, in liber 91 of mort- gages, on pages 363 and 364, and from such record the same appears to have been signed and executed by your oratrix.

"Your oratrix further states, and charges the fact to be, that said discharges of mortgages, if the same were ever signed and executed by your oratrix, were procured by said Kenyon by false and fraudulent representations, and were made without consideration or payment of any kind, and were procured without the knowledge of your oratrix as to their real character."

The defendants by their answer denied all of complainant's charges of fraud, and averred that the papers were executed understandingly by complainant, and—

"That after the execution and acknowledgment by the said complainant of the said assignment of the Yourex mortgage and the said two discharges of mortgages thereafter on the said 14th day of September, A. D. 1904, at the home of said complainant in the city of Battle Creek, Mich., in consideration of the sum of $2,700 then and there paid to the said complainant by the said Levi Kenyon, the said complainant delivered unto this defendant the Yourex mortgage and note and said assignment of the same, together with the two discharges of mortgages so executed and acknowledged by her as aforesaid, but then and there intending to cheat and defraud these defendants, and, well knowing that this defendant could not read, fraudulently retained in her possession the original mortgages and notes so given by these defendants to said complainant, and so fully paid, discharged, and satisfied."

The case was heard in open court and the bill dismissed. The circuit judge in the course of his opinion says:

"The gist of the matter is as to whether Levi Kenyon paid complainant on that day $2,700 in payment of the

discharged mortgages and the Yourex mortgage assigned to said Kenyon. He says he did. She says he did not. To find either way will lead to some unnatural conclusions, or in other words to find either way will establish as a fact or facts in the case some unnatural business procedure. A careful consideration of the entire case and the proofs offered and received leads me to the conclusion that the contention of the complainant is not the truth in the case, and I do not think she has established the claim of her bill."

The complainant's version of the transactions of September 14, 1904, is that on that day Kenyon came to her home in Battle Creek and paid her $15, which she indorsed on the $1,250 mortgage in the presence of a Mrs. Stevens, who brought her pen and ink for that purpose. She swore that that was all the money paid her on that day; that she received no consideration for the execution of the papers; that Kenyon said he would need a power of attorney in order that he might collect the Yourex mortgage for her.

"I didn't hesitate. I was so anxious to have the money. I wanted to pay all I owed on my place."

She and Kenyon went down town together. She directed Kenyon to Mr. Bidwell's office, and waited nearly an hour for him at a bank. They then went together to Bidwell's office.

"*Q.* When you went up there, the papers were all ready?

"*A.* They were, and I walked right in and signed them. * * *

"*Q.* Didn't you think it was rather peculiar that it was necessary for you to sign your name several times in order to make a power of attorney?

"*A.* I didn't realize that I signed it but once; that is true.

"*Q.* Were you a little off mentally that day?

"*A.* I was very, very poorly. I was sick. I wasn't fit to have went down there."

Mary E. Stevens testified: That she went to complainant's house to reside the last part of August, 1904, and

left there in May, 1905. That she was there September 14, 1904, and saw Kenyon there that day, and heard him tell complainant that he had come to pay her $15, and saw the money in her hand. That she took in the pen and ink.

"I heard her speak about the Yourex mortgage. She was to go down with Mr. Kenyon, and give him power of attorney to collect this money. She was to sign a paper to give him power of attorney to collect it. I saw her go into the bedroom and get a paper and bring it out, and then Mr. Kenyon had arisen from the table and stepped back a little towards the door that went out, and I saw Mrs. Watrous walk across and hand him a paper. I know she went down town with him. I was there during the afternoon and evening. I was not away all that day. I did not see him there again that day, or hear of him being there. * * * I didn't go away from the house at all."

She also testified that she was at the house September 15th all day, and did not see Kenyon there, and that Mrs. Watrous was also there.

Kenyon testified: That he called on complainant August 21, 1904, in response to the following letter conceded to have been written for complainant by her sister, Mrs. Brouthers, viz.:

"BATTLE CREEK, MICH., Aug. 19, 1904.
"Mr. KYNON: I came Back to Mrs. Watrous this morning found her sick and ought of money to help herself with She wanted me to say to you that you had promised to ras her sum money ear this has wrote you and do not hear from you She say if you do not rase her sum money soon she will have to put it in a colecter's hands for she has to ras mon to pay her bills as well as to live the first of Nove she has to ras nine hundred and fifty dollers which has to bee pade She would like for you to remorgage the twelve hundred and fifty and intres and she would take it it she is sick and must have sum money Now Mr. Kenyon she wants you to let her hear from you at once or she will have to have sumpthing dun hope to hear from you soon.
"Wrote by
"L. M. BROTHERS."

That on that day he paid her $150, and it was agreed that if he paid her $2,700 on or before October 1, 1904, he should have the three mortgages. That it was in pursuance of this arrangement that he called upon her September 14th. That they went together directly to the office of Mr. Bidwell. That complainant carried with her the three mortgages. That she gave instructions to Mr. Bidwell and his son to execute the discharges and assignment in presence of a Mr. Annis. That she was in the office for about three-quarters of an hour while the papers were being prepared. That they were finally delivered to her, and she took them away with her. That, at her request, he went to her home to pay her and did there pay her $2,700, receiving from her an envelope which she said contained his papers, and which he supposed contained all of the mortgages. That on his return home he discovered that the mortgages given by himself and wife were not among the papers, and that on the next day he returned to Battle Creek to obtain them, but could not get in the house, and was informed by a neighbor that complainant had gone to Detroit. That he made no further attempt to find her, and did not record the discharges and assignment until May 15, 1905.

Mrs. Brouthers testified that she " was there àll winter after writing that letter until the next May;" that she was there all day Sunday, August 21, 1904, and did not see Mr. Kenyon there, and he could not have been there and had a long conversation with complainant without her knowing it.

"*Q.* He couldn't possibly have met her in that room, and seen your sick sister on that Sunday without your knowing it?

"*A.* He could not. He never was there. Now, that is so."

Complainant testified: That the first time she called at defendants' home for the purpose of getting interest money after September 14, 1904, was in September, 1905,

when Mr. Dolph was with her. That on September 14, 1904, he came in and paid her $15.

"First he gave me a pencil. He said: 'Here is a pencil. You can indorse it on there.' I indorsed $15 on the $1,250. * * *

"Q. Did you put it on with a pencil?

"A. The lady brought her pen and ink, come in the room and gave it to me, and I put it on there. * * * It is true that on the 14th day of September, 1904, I delivered the Yourex mortgage and note, together with the assignment of that mortgage and note, to Mr. Kenyon. I cannot tell where Yourex mortgage and note are now. You must ask Mr. Kenyon. I turned them over to him September 14, 1904. It was turned over to him so that he could collect it. I gave him power of attorney to collect that mortgage. I gave that mortgage to him in my house. He took it down town, and I went with him. I did not ask him for the note and mortgage again that day, for he was going to collect the money for me. * * *

"Q. Isn't it true your sister a short time before this at your instigation had written Mr. Kenyon for money?

"A. My sister was not there at that time, but I wrote to him and other people wrote to him. I don't think my sister wrote about that time.

"Q. On the 19th of August, 1904?

"A. No; that ain't true. Mrs. Brouthers was not to my house. * * *

"Q. State whether that is her signature.

"A. Well, sir, I will tell you. I could not be positive about it, but my sister is here. She could speak for herself. I authorized a letter to be written to Mr. Kenyon by the lady that was at my house at that time, and the words in this letter are pretty much as I told her to write. I must have authorized this letter. I wanted money so bad. * * *

"Q. Are her initials L. M.?

"A. That is her initials, but I don't see how they got there, because she was not at my house in 1904. I was very hard up at that time.

"Q. In response to that letter, isn't it true Mr. Kenyon came to your house on the 21st, which was Sunday, drove over there from his home, and found you sick and paid you $150?

"A. No, sir. * * *

"*Q.* When these assignments were drawn in September, 1904, you claimed to be a resident of Chicago?

"*A.* I wasn't there at that time. I was in Chicago then.

"*Q.* You went back that very night?

"*A.* No; I intended to have went back, but I did not. My health failed me.

"*Q.* Were you at home on the 15th of September?

"*A.* I couldn't tell whether I was or was not. I can't remember dates as I would like to. * * *

"*Q.* You are positive you did not have these mortgages with you at Bidwell's office on the day when he drew up these papers?

"*A.* Why, most assuredly I am. * * *

"*Q.* Isn't it true in that workbag you had the three mortgages and notes?

"*A.* No; I can prove they were locked in my bedroom. I told the lady to lock my door as I went out. They were in my bedroom on the 14th of September, 1904, only when I brought out the mortgage and signed that $15 on it."

As affecting the probability of complainant's claim that she understood that she was executing a power of attorney, defendants produced a power of attorney dated September 14, 1901, executed by complainant to defendant Sarah J. Kenyon authorizing her—

"To make collection and receipt for all collections made by her upon credits due the said Mary E. Watrous from any person or persons, firm, corporation or individuals, who are residents of Barry and Eaton couuties in the State of Michigan; the said Mary E. Watrous having loaned money to divers persons in said counties and contemplating the loaning of further amounts in the future at divers rates of interest, the said Sarah J. Kenyon is hereby authorized to collect said amounts and the interest accruing thereon and to receipt for same in the name of said Mary E. Watrous."

Complainant testified that this power of attorney had been returned to her and destroyed by burning it. The defendants' version of the transaction in the justice's office is supported by the testimony of the justice, his son, and Mr. Annis, apparently disinterested witnesses, and not only has the complainant failed to sustain the alle-

gations of her bill in this regard, but the same are completely disproved.

If the question of payment stood alone for our consideration, unaffected by the testimony as to the execution of the papers, we might be inclined to hold that defendants did not have the $2,700 to pay, and did not pay it. But, viewed in the light of her proofs in regard to the papers, and relying to some extent upon the judgment of the circuit judge as to the credibility of witnesses, we are unable to find that complainant has established her case by a preponderance of the evidence. Her testimony is conflicting, unreliable, and, as to an important element of her case—that the discharges and assignments were obtained from her by fraud—is entirely overborne by the testimony of the Bidwells and Mr. Annis. While the testimony of the defendants as to the possession of the $2,700 and the way it was accumulated is not very satisfactory, and their conduct when Hoyt was there was not such as would ordinarily be expected of honest people, the conduct of complainant in making no request for money for over a year after September 14th, when she admits, and her letter of August 19th states, she was hard up and must have money, is equally inexplicable upon this record, except upon defendants' theory. It should be said that defendants claim that, when Dolph called, the talk was entirely about a note for $125, and not about the $1,250 note and mortgage, and we think the record supports this contention. We are not entirely satisfied that the actual transaction between these parties is disclosed by this record, but we are obliged to determine the case from the standpoint of the pleadings and the testimony before us. We are satisfied from the testimony that complainant took her mortgages to Mr. Bidwell's office, signed the two discharges and the assignment understandingly, and delivered them voluntarily to Kenyon. The possession of the papers under such circumstances and her failure for so long a time to communicate with Kenyon, knowing that he had such papers, tends to support his

claim that he paid her for them. In view of complainant's unwarranted denial of knowledge of the actual transaction in Mr. Bidwell's office, we are unable to find that complainant has sustained the allegation of her bill of complaint that she received no consideration for the execution of the papers.

The decree is affirmed.

GRANT, MONTGOMERY, MOORE, and McALVAY, JJ., concurred.