## STAPLETON v CITY OF WYANDOTTE

Docket No. 104641. Submitted March 13, 1989, at Detroit. Decided June 5, 1989.

Rebecca Stapleton was pregnant when she was admitted for treatment at Wyandotte General Hospital on July 7, 1984. Prior to her discharge on July 17, 1984, Stapleton received medication ordered by Drs. Brownell and Hoprasart and was advised by another physician to undergo a checkup two weeks after discharge. However, within a week of her discharge, an ultrasound examination at a clinic revealed the fetus Stapleton was carrying was dead. The fetus was then surgically removed. On July 18, 1986, Stapleton brought in the Wayne Circuit Court an action for medical malpractice against the City of Wyandotte, Dr. Brownell, Dr. Hoprasart and others. The trial court, Kathleen McDonald, J., granted summary disposition in favor of defendant doctors, ruling that plaintiff's action was barred by the statute of limitation relating to medical malpractice actions. Plaintiff appealed.

The Court of Appeals *held:*

An action for medical malpractice must be brought within two years of the last date the defendant provided treatment or within six months after the plaintiff discovers or should have discovered the existence of a claim, whichever is later.

1. In this case, the trial court did not err in ruling that plaintiff's action was not filed within two years of the last date of treatment. Plaintiff admitted at deposition that she had no intention of consulting the defendant doctors after her discharge from the hospital on July 17, 1984. Plaintiff's relationship with these doctors was not extended beyond her discharge merely because another physician had suggested that she return for a checkup two weeks after discharge.

2. The trial court did not err in ruling that, based on plaintiff's deposition testimony, plaintiff knew or should have

REFERENCES

Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 318 *et seq.*

Statute of limitations applicable to malpractice action against physician, surgeon, dentist, or similar practitioner. 80 ALR2d 320.

discovered the existence of a malpractice claim more than six months before she filed her action.

Affirmed.

1. LIMITATION OF ACTIONS — MEDICAL MALPRACTICE.

An action for medical malpractice must be brought within two years of the last date the defendant provided treatment or within six months after the plaintiff discovers or should have discovered the existence of a claim, whichever is later (MCL 600.5805, 600.5838; MSA 27A.5805, 27A.5838).

2. LIMITATION OF ACTIONS — MEDICAL MALPRACTICE — LAST-TREATMENT RULE.

The essence of the last-treatment rule for statute of limitation purposes in medical malpractice actions is that the cessation of the ongoing physician-patient relationship marks the point where the period of limitation begins to run.

3. LIMITATION OF ACTIONS — MEDICAL MALPRACTICE — DISCOVERY OF CLAIM.

A plaintiff is held to have discovered the existence of a medical malpractice claim when (1) the act or omission of the defendant becomes known and (2) the plaintiff has reason to believe that medical treatment was improper or was performed in an improper manner.

*Stern & Cohan* (by *Kenneth A. Stern*), for plaintiff.

*Plunkett & Cooney, P.C.* (by *Robert G. Kamenec*), for defendants Brownell and Hoprasart.

Before: WAHLS, P.J., and REILLY and G. S. ALLEN,* JJ.

WAHLS, P.J. Plaintiff, Rebecca Stapleton, appeals as of right in this medical malpractice action from an October 30, 1987, order of the Wayne Circuit Court granting the motion for summary disposition of defendants Brownell and Hoprasart under MCR 2.116(C)(7) on the basis that plaintiff's claims

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

are barred due to a lapse of the applicable period of limitation.[1] We affirm.

The record reveals that when plaintiff, who was born on October 17, 1965, was six to eight weeks pregnant she went to Wyandotte General Hospital on July 7, 1984, complaining of persistent nausea and vomiting. During her ten-day stay in the hospital, she was under the care of several physicians, including defendants Brownell and Hoprasart. She was given the medication Compazine, after which she experienced severe muscle spasms. Eventually, the muscle spasms subsided and she was discharged from the hospital on July 17, 1984. In her deposition, plaintiff testified that before she was discharged a physician told her to return for a checkup in two weeks. Within a week after her discharge from the hospital, plaintiff went to the Northland Family Planning Clinic, apparently intending to have an abortion. At the clinic, an ultrasound examination revealed that the fetus was dead. It was then surgically removed.

Plaintiff filed the present medical malpractice lawsuit on July 18, 1986, alleging, in essence, that the medication she received while at the hospital, particularly the Compazine, was negligently prescribed so as to have caused the severe muscle spasms and the death of the fetus, as well as injury to herself. Following the filing of an amended complaint, the hospital, on August 10, 1987, and defendants Brownell and Hoprasart, on August 21, 1987, filed motions for summary disposition on the basis that plaintiff's claim was barred by the period of limitation applicable to medical malpractice lawsuits. The trial court granted the motions, finding that plaintiff had failed to file suit

[1] Summary disposition was also granted in favor of the remaining defendants, but, apparently, the latter were subsequently dismissed from the case upon stipulation of the parties.

within two years of her last date of treatment, which was July 17, 1984, and that plaintiff had discovered, or should have discovered, the existence of a claim more than six months prior to the filing of her suit.[2]

On appeal, plaintiff first argues that the trial court erred in ruling that her lawsuit was barred because it was not filed within the two-year period of limitation applicable to medical malpractice cases. On this issue plaintiff raises two subarguments, namely, that she did not stop treating with defendants Brownell and Hoprasart until two weeks after her discharge from the hospital, when she intentionally missed an appointment for a check up suggested by a physician at the time of her discharge from the hospital on July 17, 1984, and that the applicable two-year period of limitation in her case began to run on July 18, 1984, the day after her discharge from the hospital. We find no merit in either of plaintiff's subarguments.

The period of limitation for a malpractice action is set forth in MCL 600.5805; MSA 27A.5805:

(1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the period of time prescribed by this section.

*  *  *

(4) Except as otherwise provided in this chapter, the period of limitations is 2 years for an action charging malpractice.

The accrual of plaintiff's claim in this case is

---

[2] Thereafter, plaintiff filed a motion for reconsideration and a motion for leave to amend her complaint. Both motions were denied in an order issued on November 20, 1978, and have not been the subject of an appeal to this Court.

determined under MCL 600.5838(1); MSA 27A.5838(1), as it appeared prior to its amendment in 1986:[3]

> A claim based on the malpractice of a person who is, or holds himself out to be, a member of a state licensed profession . . . accrues at the time that person *discontinues treating or otherwise serving the plaintiff* in a professional or pseudoprofessional capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim. [Emphasis added.]

What constitutes "treating or otherwise serving" under § 38(1) is a matter of statutory construction and is a question of law for the courts. *Coddington v Robertson,* 160 Mich App 406, 410; 407 NW2d 666 (1987). The essence of that phrase implies that the cessation of an ongoing physician-patient relationship marks the point at which the period of limitation begins to run. *Pendell v Jarka,* 156 Mich 405, 409-410; 402 NW2d 23 (1986), lv den 428 Mich 880 (1987).

Regarding the purposes of periods of limitation and decisions whether to grant motions for summary disposition on the basis of the expiration of an applicable period of limitation, this Court has stated:

> The underlying purposes behind statutes of limitation are to require that complaints be filed within a reasonable time so that the opposing

---

[3] MCL 600.5838(1); MSA 27A.5838(1), as amended by 1986 PA 178, provides, in pertinent part:

> [A] claim based on the malpractice of a person who is, or holds himself or herself out to be, a member of a state licensed profession accrues at the time that person discontinues serving the plaintiff in a professional or pseudoprofessional capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.

parties have a fair opportunity to defend, to relieve the court system from dealing with stale claims, and to protect potential defendants from protracted fear of litigation. *Bigelow v Walraven,* 392 Mich 566, 576; 221 NW2d 328 (1974). In considering a motion for accelerated judgment based on a statute of limitations, the trial court is to consider the pleadings, affidavits, depositions, admissions and documentary evidence submitted by the parties. MCR 2.116(G)(5). The motion may not be granted if there exist material fact issues in dispute regarding discovery of the asserted malpractice. *Kelleher v Mills,* 70 Mich App 360, 365; 245 NW2d 749 (1976). But if the facts are not in dispute, the issue whether the claim is statutorily barred becomes one of law for the court. *Smith v Sinai Hosp,* 152 Mich App 716, 724-725; 394 NW2d 82 (1986). See also *Schalm v Mt Clemens Gen Hospital,* 82 Mich App 669, 672; 267 NW2d 479 (1978). [*Coddington, supra,* pp 409-410.]

In this case, we do not hesitate to agree with the trial court that plaintiff's own deposition testimony establishes that defendants Brownell and Hoprasart were not treating or otherwise serving plaintiff after her discharge from the hospital on July 17, 1984. The advice given by an unidentified physician to plaintiff on the date of her discharge from the hospital to make an appointment for a checkup in two weeks did not alone serve to extend the physician-patient relationship shared by plaintiff and defendants Brownell and Hoprasart during plaintiff's ten-day hospital stay. Plaintiff herself acknowledged at her deposition that when she was discharged she was given no instructions or prescriptions and that "they just said if I wanted to continue seeing them [defendants Brownell and Hoprasart] to give them a call, but that I did need to see a doctor for my monthly [pregnancy] checkups." Clearly, plaintiff had no inten-

tion of seeking treatment from defendants Brownell and Hoprasart after she was discharged from the hospital on July 17, 1984. She admitted as much by asserting, "I didn't want to see them after what they did to me in the hospital."

The cases cited by plaintiff are clearly distinguishable. For example, in *Thomas v Golden,* 51 Mich App 253; 214 NW2d 907 (1974), modified 51 Mich App 693; 214 NW2d 907 (1974), aff'd without adopting reasoning 392 Mich 779; 220 NW2d 677 (1974), the plaintiff requested, and was given, an appointment for the continued treatment of her eyes, but did not keep the appointment, apparently because she sought and received emergency treatment in a hospital the day prior to her scheduled appointment with the defendant, and in *Shane v Mouw,* 116 Mich App 737; 323 NW2d 537 (1982), neither the physician nor the plaintiff intended their longstanding relationship to end at the time the plaintiff's son, on the plaintiff's behalf, telephoned the plaintiff's physician approximately one month after the plaintiff's last office visit and discussed the plaintiff's condition.

Plaintiff's second subargument on this issue is that the applicable two-year period of limitation in her case began to run on July 18, 1984, the day after her discharge from the hospital, and lapsed on July 18, 1986. In support of her position, plaintiff cites MCR 1.108, which provides:

In computing a period of time prescribed or allowed by these rules, by court order, or by statute, the following rules apply:

(1) The day of the act, event, or default after which the designated period of time begins to run is not included. The last day of the period is included, unless it is a Saturday, Sunday, legal holiday, or holiday on which the court is closed pursuant to court order; in that event the period

runs until the end of the next day that is not a Saturday, Sunday, legal holiday, or holiday on which the court is closed pursuant to court order.

(2) If a period is measured by a number of weeks, the last day of the period is the same day of the week as the day on which the period began.

(3) If a period is measured by months or years, the last day of the period is the same day of the month as the day on which the period began. If what would otherwise be the final month does not include that day, the last day of the period is the last day of that month. For example "2 months" after January 31 is March 31, and "3 months" after January 31 is April 30.

Applying this court rule to the facts in this case, we find that the two-year period of limitation lapsed on July 17, 1986, not July 18, 1986. Under subrule (1), July 17, 1984, the day of plaintiff's discharge from the hospital, is not to be counted, but July 17, 1986, the last day of the period, is to be counted. Moreover, under subrule (3), July 17, 1986, would be the date on which the two-year period ended. This calculation is consistent with the examples provided in subrule (3) such that " '2 months' after January 31 is March 31, and '3 months' after January 31 is April 30." In this case, two years after July 17, 1984—after beginning the calculation by making July 18, 1984, the first day to be counted in the two-year period—is July 17, 1986. See *Wise v Sisters of Mercy,* 21 Mich App 134; 175 NW2d 33 (1970).

Second, plaintiff argues on appeal that the trial court erred in ruling that her lawsuit was barred because she discovered, or should have discovered, the existence of a cause of action more than six months prior to having filed suit.

MCL 600.5838(2); MSA 27A.5838(2) provides, in pertinent part:

An action involving a claim based on malpractice may be commenced at any time within the applicable period prescribed in sections 5805 . . . or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later.

Regarding this six-month discovery rule, this Court has stated:

A plaintiff is held to have discovered the existence of a malpractice claim when: (1) the act or omission of the defendant becomes known and (2) the plaintiff has reason to believe that medical treatment was improper or was performed in an improper manner. *Kelly v Richmond,* 156 Mich App 699; 402 NW2d 73 (1986); *Juravle v Ozdagler,* 149 Mich App 148; 385 NW2d 627 (1985).

* * *

Once it is shown that the two-pronged test mentioned above has been met, the court may conclude as a matter of law that plaintiff discovered or should have discovered the asserted malpractice and grant defendants' motion for summary disposition. *Blana v Spezia;* 155 Mich App 348; 399 NW2d 511 (1986); *Lefever v American Red Cross,* 108 Mich App 69; 310 NW2d 278 (1981). The trial court's findings will not be reversed unless clearly erroneous. *Blana, supra,* p 354. [*Weisburg v Lee,* 161 Mich App 443, 447-448; 411 NW2d 728 (1987).]

We do not hesitate in concluding, as did the trial court, that plaintiff, long before the six months immediately preceding the filing of this case, had reason to believe, and did believe, that the medical treatment she received from defendants Brownell and Hoprasart was improper. At her deposition, while being questioned about the circumstances surrounding her discharge from the hospital on July 17, 1984, and the offering of further care by defendants Brownell and Hoprasart, plaintiff

stated that when she was discharged she told a staff physician that "I was going to have a checkup to see if [the fetus] was healthy or not," adding, "[f]or going through what I went through and having them drugs, I didn't know if I was going to have a healthy baby or not, so I wanted to be certain before I went any further along in my pregnancy." Within a week after having been discharged from the hospital, plaintiff went to the Northland Family Planning Clinic, where an ultrasound test was performed and it was determined that the fetus was dead. In her deposition, plaintiff testified that she told nurses at the clinic about her experience at Wyandotte General Hospital regarding "going through . . . muscle spasms [and having been given certain] drugs," and was told by the nurses that "that could have been the cause" of the fetus' death. During her deposition, plaintiff also admitted that during the summer of 1984 she thought that defendants Brownell and Hoprasart had improperly treated her with drugs. In addition, plaintiff stated that at the time she went to the Northland Family Planning Clinic during the week after having been discharged from the hospital, she had no intention of ever again seeking the professional services of defendants Brownell and Hoprasart. At her deposition, plaintiff insisted, while denying that the sole purpose of her visit to the Northland Family Planning Clinic was to obtain an abortion,[4] that she had told

---

[4] Regarding her purpose in going to the Northland Family Planing Clinic during the week after her discharge from Wyandotte General Hospital on July 17, 1984, plaintiff was asked and answered the following questions during her April 2, 1987, deposition:

Q. You knew when you called Northland [Family Planning Clinic] that their principal business was abortions, did you not?

A. Also birth control and other things, yes.

Q. You knew principally that their business was giving abortions?

A. Yes.

the staff at the clinic that she had come to the clinic because she was concerned about what had happened to her at the hospital while under the care of defendants Brownell and Hoprasart. Finally, we note that, even in her appellate brief, plaintiff concedes that, all along, she had "a vague notion that she should not have received certain shots during her hospital stay."

In order for a medical malpractice claim to be deemed discovered under the six-month discovery rule, a plaintiff need only have reason to believe that his or her treatment was improper. "This

Q. Now, you went to Northland with whom please? Was it your mother did you say?

A. Yes, it was.

Q. And when you got there, you talked with a counselor, did you not?

A. Yes, I did.

Q. And the counselor asked you a number of questions, right?

A. Yes.

Q. And I suppose one of the questions was why don't you want to have the baby?

A. Right.

Q. I'm sorry?

A. Right.

Q. And what did you say to the counselor when she asked that question?

A. I believe I told her what I went through at Wyandotte.

Q. When you say—I'm sorry. Go ahead.

A. The experience that I experienced at Wyandotte, and I didn't know if my baby would be healthy or not.

Q. When you say I believe, that makes me think, maybe incorrectly, that you're not certain.

A. I'm not for certain what I said at that time.

Q. If their form says that the reason that you gave—the primary reason for an abortion was because you could not afford it and you were not ready for a child, would you disagree with that?

A. I might have said that, but I also was concerned about Wyandotte too.

Q. The question is whether or not that is the information that you gave the people at Northland, I don't want to have a baby because I can't afford it and I'm not ready to have a baby? Is that what you told them?

A. Yes.

does not require the advice of an attorney, but merely requires a subjective belief that a malpractice claim is possible." *Antal v Porretta,* 165 Mich App 238, 242; 418 NW2d 395 (1987). According to plaintiff's own deposition testimony in this case, she had such a subjective belief in July, 1984, much longer than six months prior to the filing of her lawsuit in July, 1986. Therefore, the trial court did not err in ruling that this lawsuit was barred because plaintiff discovered, or should have discovered, the existence of a cause of action more than six months prior to having filed suit.

Finally, plaintiff argues on appeal that "the applicable statute of limitations for plaintiff's claim of breach of express contract is that for breach of contract is [sic] [MCL 600.5807; MSA 27A.5807] and for plaintiff's claim of breach of implied contract is three (3) years pursuant to [MCL 600.5805; MSA 27A.5805]." The question whether plaintiff's claim sounds solely in malpractice or whether it sounds also in contract, see, e.g., *Baldyga v Independence Health Plan,* 162 Mich App 441; 413 NW2d 30 (1987); *Barnard v Dilley,* 134 Mich App 375; 350 NW2d 887 (1984), was neither addressed nor decided by the trial court, and thus has not been preserved for appeal. *Joe Dwyer, Inc v Jaguar Cars, Inc,* 167 Mich App 672, 685; 423 NW2d 311 (1988).

Affirmed.