MORGAN v TAYLOR

Docket No. 83071. Argued November 7, 1989 (Calendar No. 2). Decided
  March 6, 1990.

   David Morgan and Paulette Morgan brought separate actions in
     the Oakland Circuit Court against Dr. Marcus Taylor and
     Cooperative Optical Services, alleging medical malpractice in
     failing to refer David Morgan to an ophthalmologist following a
     March 7, 1981, eye examination which disclosed that he had
     glaucoma. The court, Norman L. Lippitt, J., consolidated the
     actions, dismissed Dr. Taylor as a party, and denied summary
     disposition for the defendants on the basis of the statute of
     limitations, finding that a subsequent examination of Mr. Mor-
     gan in August, 1983, amounted to a continuation of treatment
     or services within the meaning of the applicable malpractice
     statute. The Court of Appeals, GILLIS, P.J., and WEAVER and
     G. S. ALLEN, JJ., reversed in an unpublished opinion per cu-
     riam (Docket No. 95032). The plaintiffs appeal.

     In a unanimous opinion by Justice GRIFFIN, the Supreme
   Court held:

     The defendant did not discontinue treating or otherwise
   serving the plaintiff as to the matters out of which the claim
   for malpractice arose until August 18, 1983. Thus, the
   plaintiff's claim is not barred by the statute of limitations.

     1. The statute in effect at the time this claim arose provided
   that a claim based on the malpractice of a licensed health
   professional accrued when that person discontinued treating or
   otherwise serving the plaintiff as to the matters out of which
   the claim arose. The cessation of the ongoing patient-physician
   relationship marks the point where the statute of limitations
   begins to run, i.e., it begins when there is an occurrence
   between visits which indicates that the original doctor-patient
   relationship and its accompanying air of trustfulness have been
   terminated. In this case, there was no occurrence between the
   examination of the plaintiff's eyes in March, 1981, and the
   examination in August, 1983, which indicated a termination of
   the relationship between the plaintiff and the defendant. The
   plaintiff received no eye care during the interim, and no event

occurred between the two visits which demonstrated any abandonment by the plaintiff of his trust in the defendant and its staff.

2. The applicable statute provides for no exception on the basis of the type of health care provided. It is the doctor's assurance upon completion of the periodic examination that the patient is in good health which induces the patient to take no further action other than scheduling the next periodic examination. In light of the contractual arrangement which bound the defendant and entitled the plaintiff to periodic eye examinations, it cannot be said that the relationship between the plaintiff and the defendant terminated after each visit. The obligation and responsibility of the defendant to provide glaucoma testing extended beyond the 1981 examination of the plaintiff's eyes.

Reversed and remanded.

*Kutinsky, Davey & Goldman* (by *Leslie H. Kutinsky* and *Sheila Solomon*) for the plaintiffs.

*Brochert & Ward* (by *Michael J. Brochert, Linda M. Garbarino,* and *Graham Ward*) for the defendant.

GRIFFIN, J. In this malpractice action it is alleged that an examination of plaintiff's eyes revealed glaucoma symptoms, but the examining optometrist failed to refer plaintiff to an ophthalmologist. When plaintiff returned for his next routine checkup more than two years later, he was referred to a specialist and learned that he had severe glaucoma which should have been treated much earlier.

We must decide whether plaintiff's malpractice action is barred by the two-year statute of limitations, a question which turns on when his claim accrued. The statute then in effect provided that such a claim accrues when the licensed professional "discontinues treating or otherwise serving

the plaintiff . . . as to matters out of which the claim for malpractice arose . . . ."[1]

The Court of Appeals concluded that the claim is barred by the statute of limitations. We reverse.

I

During the period relevant to this lawsuit, plaintiff David Morgan[2] was an employee of D. W. Zimmerman Company, and a member of UAW Local 417. In 1975, the company and the union entered into a contract with defendant Cooperative Optical Services, Inc. (COS), under which each covered employee became entitled to an eye examination every two years. Plaintiff received eye examinations by COS staff optometrists in 1976, 1978, and on March 7, 1981, and August 18, 1983.

The 1981 eye examination, performed by Dr. Marcus Taylor, included a test for glaucoma which revealed intraocular pressure beyond the normal range. Dr. Taylor concedes that it was his practice in such cases to refer the patient to an ophthalmologist or to have the patient return for another glaucoma test; however, plaintiff asserts that he was not referred to a specialist, nor was he advised to return earlier than his next regular checkup.

On August 18, 1983, plaintiff returned to COS for his next routine eye examination. "[B]y this time," according to his deposition testimony:

> I was in school having trouble getting my right eye to focus like to read and they would water and I was having trouble with night driving and I thought maybe I needed my lenses changed.

[1] MCL 600.5838(1); MSA 27A.5838(1).

[2] Paulette Morgan, wife of David Morgan, is also a plaintiff in this action; however, since her claim for loss of consortium is derivative, for convenience sake, we use the word plaintiff in the singular to refer to David Morgan.

Plaintiff testified that this was the first time he noticed any problem with his eyes, and that he had received no eye care of any kind between March 7, 1981, and August 18, 1983.

The August 1983 examination at COS, which was performed by a different staff optometrist,[3] also revealed intraocular pressure beyond the normal range, and plaintiff was then referred to an ophthalmologist who determined that plaintiff had glaucoma. Thereafter, plaintiff was referred to Dr. Marshall Cyrlin, a glaucoma specialist. According to plaintiff, he learned from Dr. Cyrlin in December 1983 that he had sustained irreversible nerve damage, that he might ultimately lose sight in both eyes, and that he should have been referred to an ophthalmologist much earlier than August 1983.

Plaintiff and his wife, Paulette Morgan, filed two lawsuits, one against COS on January 30, 1985, and the other against Dr. Taylor on August 14, 1985.[4] Each complaint alleged malpractice in connection with the March 7, 1981, examination for failure, inter alia, to diagnose glaucoma and to take appropriate steps to refer plaintiff for treatment.[5] The trial court consolidated the two actions.

[3] Dr. Taylor was no longer employed by COS on August 18, 1983.

[4] Paulette Morgan claims damages for loss of the "use, services, love, affection and companionship" of her husband.

[5] The complaint against COS alleged that it:

a. Failed to keep proper records of the examinations they made of Plaintiff's eyes;

b. Failed to use diagnostic tools, apparatus, equipment and tests which were known to Defendant and its agents and employees and available to them;

c. Failed to take an adequate and perform a proper eye examination and/or evaluation;

d. Failed to diagnose and/or recognize that Plaintiff was suffering from glaucoma;

e. Failed to inform Plaintiff of test results;

Dr. Taylor was dismissed as a party;[6] however, a motion by defendant cos for summary disposition upon the basis of the statute of limitations was denied. Finding that the August 1983 examination amounted to a continuation of treatment or services within the meaning of MCL 600.5838(1); MSA 27A.5838(1), the trial court concluded that the suit against defendant cos was not barred by the statute of limitations because it had been filed within two years of the date when the action accrued.

The Court of Appeals reversed,[7] and we granted leave to appeal. 432 Mich 893 (1989).

II

The applicable statutes required that a medical malpractice action be brought within two years of the date when the claim accrues,[8] or within six months of the time the plaintiff discovered or should have discovered the existence of the claim,

f. Failed to refer Plaintiff to an opthamologist [sic] for proper medical care and treatment.

[6] Initially, a motion by Dr. Taylor for summary disposition was denied; however, upon reconsideration it was granted by the trial court upon grounds not relevant in this appeal. Because this appeal relates only to the claim against cos, we hereafter refer to cos as the defendant.

[7] The unpublished opinion per curiam of the Court of Appeals, decided March 31, 1988 (Docket No. 95032), GILLIS, J., concurring only in the result.

[8]     A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.

*  *  *

(4) The period of limitations is 2 years for an action charging malpractice. [MCL 600.5805; MSA 27A.5805.]

whichever is later.[9] Conceding that he had knowledge of the malpractice claim in December 1983, plaintiff does not rely on the six-month discovery provision.

Defendant argues that the two-year statute of limitation bars plaintiff's cause of action because it accrued when he was examined on March 7, 1981, and plaintiff's complaint was not filed until January 30, 1985. On the other hand, plaintiff contends that his action is not barred because it did not accrue, and the two-year limitation period did not begin to run, until the subsequent August 18, 1983, examination when plaintiff was referred to an ophthalmologist. At that time, the malpractice statute of limitations, as amended by 1975 PA 142,[10] provided:

A claim based on the malpractice of a person who is, or holds himself out to be, a . . . licensed health professional,[11] *accrues* at the time that person *discontinues treating or otherwise serving* the plaintiff in a professional or pseudoprofessional capacity as to the matters out of which the claim for malpractice arose, regardless of the time the

---

[9]   (2) An action involving a claim based on malpractice may be commenced at any time within the applicable period prescribed in sections 5805 or 5851 to 5856, or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later. The burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition or otherwise, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim shall be on the plaintiff. A malpractice action which is not commenced within the time prescribed by this subsection is barred. [MCL 600.5838(2); MSA 27A.5838(2).]

[10] MCL 600.5838(1); MSA 27A.5838(1). 1975 PA 142 amended Section 5838 of 1961 PA 236, the Revised Judicature Act of 1961.

[11] An optometrist must be licensed by the state to practice that profession. See MCL 333.17401 *et seq.*; MSA 14.15(17401) *et seq.*

plaintiff discovers or otherwise has knowledge of the claim.[12] [Emphasis added.]

We must determine, then, whether plaintiff's claim accrued in March 1981 or in August 1983. Resolution of that controversy hinges on the meaning of the words "discontinues treating or otherwise serving" as they appeared in MCL 600.5838(1); MSA 27A.5838(1). Of course, it is plaintiff's position that his last treatment at the hands of defendant as to "matters out of which the claim for malpractice arose" occurred in August 1983. Defendant cos asserts, on the other hand, that each of plaintiff's visits for an eye examination was an isolated visit, and that the last treatment by defendant with respect to matters arising out of the March 1981 examination occurred on the date of that visit. Defendant relies on a line of Court of Appeals decisions holding that a subsequent visit to a health professional, unrelated to the original treatment of an illness or injury, does not toll the statute of limitations.

Because the statutory language at the heart of this controversy represents a codification of the judge-made "last treatment rule," we believe a brief review relating to the development of that

___

12 As to causes of action arising after October 1, 1986, this provision was amended by 1986 PA 178 and eliminated the last treatment rule in cases of medical malpractice:

(1) A claim based on the medical malpractice of a person who is, or who holds himself or herself out to be, a licensed health care professional, licensed health facility or agency, employee or agent of a licensed health facility or agency who is engaging in or otherwise assisting in medical care and treatment, or any other health care professional, whether or not licensed by the state, accrues at the time of the act or omission which is the basis for the claim of medical malpractice, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim. [MCL 600.5838a(1); MSA 27A.5838(1)(1).]

rule, and the rationale behind it, will prove helpful.[13]

## A

In Michigan, the last treatment rule originated in *De Haan v Winter,* 258 Mich 293, 296-297; 241 NW 923 (1932), when the limitation statute contained no provision fixing the accrual point of a malpractice action. The plaintiff in *De Haan* was treated for a fractured leg by a physician who aligned the bones and encased the leg in a plaster cast. Until then, the treatment was considered proper, but it was alleged that malpractice followed in not taking x-ray pictures and in failing to provide certain other treatment during the curative process. In determining the date when a malpractice action accrued, this Court stated:

> Until treatment of the fracture ceased the relation of patient and physician continued, and the statute of limitations did not run. While decisions are not in accord upon this question, we are satisfied that in such an action as this the statute of limitations does not commence to run while treatment of the fracture continues. Failure to give needed continued care and treatment, under opportunity and obligation to do so, would constitute malpractice. During the course of treatment plaintiff was not put to inquiry relative to the treatment accorded him. [Citation omitted.]

The rationale for the last treatment rule has

[13] Legislative comment which accompanied enactment of MCL 600.5838; MSA 27A.5838 as part of the Revised Judicature Act, 1961 PA 236, indicates that "Section 5838 is based on the rule stated and followed in the Michigan case of *De Haan v Winter,* 258 Mich 293; 241 NW 923 (1932)." See also *Dyke v Richard,* 390 Mich 739; 213 NW2d 185 (1973). In *De Haan,* the Court adopted what is commonly referred to as "the last treatment rule" in determining the time that a malpractice cause of action accrues.

been explained on grounds that the patient, while the treatment continues, "relies completely on his physician and is under no duty to inquire into the effectiveness of the latter's measures." Lillich, *The malpractice statute of limitations in New York and other jurisdictions,* 47 Cornell L Q 339, 361 (1962) (citing *De Haan v Winter).*

As the Court of Appeals stated in *Heisler v Rogers,* 113 Mich App 630, 633; 318 NW2d 503 (1982):

> The essence of the last treatment rule is that the cessation of the ongoing patient-physician relationship marks the point where the statute of limitations begins to run.

In *Heisler,* the defendant physician performed a laminectomy on a patient in September 1972 and left a piece of broken needle in his back. For six years the defendant and patient had no contact, but during that period the patient, on his own initiative, consulted two neurosurgeons and sought treatment for his back from specialists at the Mayo Clinic. Thereafter, in 1978, the patient returned to the defendant for treatment, and then filed suit against him in 1979. Pointing to the plaintiff's interim reliance on other physicians over a six-year period, the Court concluded that the limitation period had expired, and explained:

> [T]he ongoing doctor-patient relationship *and its accompanying air of trustfulness* in one's own doctor ended in September of 1972. It is that date which should be used in calculating the statute of limitations . . . . To allow a single visit after six years to extend or revive the statute of limitations would invite abuse and stale claims. [*Id.* at 634. Emphasis added.]

B

Since *De Haan,* this Court has not explored the

contours of the last treatment rule.[14] Nor has the Court of Appeals examined the rule in the context of routine visits to a clinic or health professional at intervals determined by the health professional for examination and other services aimed at detecting and preventing illness. Generally speaking, the decisions of the Court of Appeals have applied the rule in the context of a subsequent visit where the patient originally sought treatment for a particular illness or injury. In those cases, it has been held that the limitation period begins to run when there is an "occurrence" between visits which indicates that the original doctor-patient relationship and its "accompanying air of trustfulness" have been terminated.[15]

[14] As already noted, the last treatment rule announced in *De Haan, supra,* was codified in Section 5838 of 1961 PA 236, the Revised Judicature Act of 1961, MCL 600.5838; MSA 27A.5838. The rule was amended by 1975 PA 142, and later repealed by 1986 PA 178 as to medical malpractice actions arising after October 1, 1986. See ns 10 and 12. See also *Johnson v Caldwell,* 371 Mich 368; 123 NW2d 785 (1963).

[15] See *Shane v Mouw,* 116 Mich App 737; 323 NW2d 537 (1982) (the Court found no evidence of an occurrence between the last office visit and a telephone conversation one month later which indicated that either party intended to discontinue the doctor-patient relationship); *Pendell v Jarka,* 156 Mich App 405; 402 NW2d 23 (1986) (noting that an occurrence between office visits may end the doctor-patient relationship). In other cases, the facts indicated an occurrence, such as the plaintiff's consultation with attorneys concerning a possible malpractice claim or the plaintiff's decision to no longer treat the defendant, severed the doctor-patient relationship. For example, in *Juravle v Ozdagler,* 149 Mich App 148; 385 NW2d 627 (1985), the defendant physician performed surgery and provided follow-up care to the plaintiff. Thereafter, the plaintiff consulted another physician, entered a hospital where he was treated by a third physician, and consulted with attorneys concerning a possible malpractice action. The plaintiff returned to the defendant's office after consulting his attorneys, to pick up his medical records. The plaintiff argued that the visit to pick up his records constituted "treatment." The Court of Appeals held that the doctor-patient relationship

did not exist when the plaintiff's only purpose was to obtain his records for another doctor and he had previously consulted with various attorneys to bring a malpractice suit. [*Juravle, supra* at 155.]

In *Bosel v Babcock,* 153 Mich App 592; 396 NW2d 448 (1986), for example, the defendant physician performed surgery twice on the plaintiff's fractured leg, inserting a nail each time to facilitate healing. When the plaintiff fractured his leg again, the physician advised that he could attempt treatment with a third nail or the plaintiff could be transferred to another hospital for treatment by a different physician. The plaintiff opted for the transfer. More than two years later, the plaintiff filed suit, and argued that the statute of limitations had been tolled by a visit he had made within that period to the defendant's office to return certain equipment related to the defendant's earlier treatments. The Court concluded:

> Due to the occurrence of the transfer of plaintiff to a different hospital for treatment by a different doctor . . . defendant discontinued treating or serving plaintiff on February 26, 1982. At that point, the parties' on-going patient-physician relationship ceased, and the limitations period began to run. [*Id.* at 596. Citation omitted.][16]

In the present case, there was no "occurrence" between the examination of plaintiff's eyes in March 1981 and the examination in August 1983 which indicated a termination of the relationship

See also *Antal v Porretta,* 165 Mich App 238; 418 NW2d 395 (1987) (the doctor-patient relationship ended and the cause of action accrued when the plaintiff decided he no longer wanted the defendant to treat him); *Stapleton v Wyandotte,* 177 Mich App 339; 441 NW2d 90 (1989) (the plaintiff's discharge from the hospital constituted the last treatment where the plaintiff admitted that she did not wish to see the defendants after discharge).

[16] The Court of Appeals distinguished *DeGrazia v Johnson,* 105 Mich App 356; 306 NW2d 512 (1981), and *Shane v Mouw,* n 15 *supra,* (holding that a phone conversation between the physician and the plaintiff constituted treating or otherwise serving) on grounds that there was no "occurrence" in those cases between the last office visit and a telephone conversation which terminated the relationship. See also *Pendell v Jarka,* n 15 *supra.*

between plaintiff and defendant. Plaintiff received no eye care during the interim, and no event occurred between the two visits which demonstrated any abandonment by plaintiff of his trust in the defendant and its staff.

III

Since the earlier decisions focused on visits for treatment of a particular injury or illness, rather than routine visits for preventative care, the Court of Appeals panel appropriately viewed this as a case of first impression. In its opinion, the panel discussed what it perceived as a dilemma in applying the statute to the routine visit case:

> We are not unmindful of the fact that the air of truthfulness and trust may extend beyond the date of a routine visit. It is the doctor's assurance that a patient is in good health that causes the patient to take no action other than scheduling the next routine visit. However, the two-year statute of limitations period does not begin to run until the air of truthfulness and trust terminates. The problem presented in the routine visit case is, assuming that the air of truthfulness and trust extends beyond a routine visit, at what point does it terminate?
>
> To hold that the air of truthfulness and trust extends from one routine visit to the next would invite stale claims when routine visits are years apart and would effectively eliminate any statute of limitations period in routine visit cases. On the other hand, to hold that the air of truthfulness and trust terminates at the conclusion of each routine visit gives no recognition to the fact that in some cases a patient trusts his or her doctor and relies on the doctor's advice long after leaving the doctor's office.

However, instead of construing the language of

the statute and applying it to the facts of this case, it appears that the panel proceeded to reverse the decision of the trial court on policy grounds alone, with little more in the way of explanation than its statement that "the problems presented by the routine visit case involving preventative illness treatment need to be addressed by the Legislature."

We have no quarrel with the panel's call to the Legislature for the revision of a statute.[17] However, until such a change is effectively made, it is the duty of a court to interpret the statute as the court finds it:

> The wisdom of the provision in question in the form in which it was enacted is a matter of legislative responsibility with which the courts may not interfere. *Michigan & Vicinity Foundry Workers Union v Enterprise Foundry Co,* 321 Mich 265 [32 NW2d 515 (1948)]. As tersely stated by Chief Justice BUTZEL in *Roosevelt Oil Co v Secretary of State,* 339 Mich 679, 694 [64 NW2d 582 (1954)], "It is the function of the court to fairly interpret a statute as it then exists; it is not the function of the court to legislate." [*Melia v Employment Security Comm,* 346 Mich 544, 561-562; 78 NW2d 273 (1956).]

As part of its rationale, the panel observed that the "six-month discovery rule eliminates some of the harshness that may occur when the two-year limitations period runs out between routine visits." However, that explanation appears to ignore the fact that the statute then applicable expressly provided that a malpractice claim shall not accrue until the health professional

---

[17] Indeed, the Legislature has seen fit to amend the statute and eliminate the last treatment rule with respect to medical malpractice claims. 1986 PA 178. However, as earlier noted, n 12, the amendment applies only to causes of action arising after October 1, 1986.

discontinues treating or otherwise serving the plaintiff . . . *regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.* [MCL 600.5838; MSA 27A.5838. Emphasis added.]

In construing the controlling statutory language, we find it significant that the provision makes no exception on the basis of the type of health care provided. Thus, the provision is applicable without regard to whether the treatment or service relates to a particular illness or to preventative care, such as eye examinations.

It is also important for purposes of this case to note that the words "or otherwise serving" were added to the last treatment rule as it was expressed in *De Haan, supra.* In other words, the Legislature saw fit to expand the rule which it codified as part of the Revised Judicature Act of 1961.

It has been suggested that the words "or otherwise serving" were inserted because the statute is designed to apply to licensed professionals who "serve" but do not "treat" their clients. See *Thomas v Golden (Amended Opinion),* 51 Mich App 693; 214 NW2d 907 (1974).[18] We find that to be a reasonable explanation, but it provides no basis to preclude application to professionals who "treat" as well as "serve" their clients.

When an optometrist performs an eye examination which includes a glaucoma test, it may not be a "treatment," but it is a "service" that is critically important to the patient. As plaintiff points out, glaucoma is an insidious disease which often manifests no symptoms to alert the victim. The patient who is told to come in for an eye examination every few years is completely dependent upon

[18] Affirmed 392 Mich 779; 220 NW2d 677 (1974) (the Court declining to adopt the reasoning set forth in the Court of Appeals opinion).

the professional to screen for glaucoma and to detect it.

In the instant case defendant argues that the rationale underlying the last treatment rule does not apply in the context of routine, periodic examinations. It is contended that there is no air of truthfulness and trust once the examination is concluded. We disagree. It is the doctor's assurance upon completion of the periodic examination that the patient is in good health which induces the patient to take no further action other than scheduling the next periodic examination.

Particularly in light of the contractual arrangement which bound defendant and entitled plaintiff to periodic eye examinations, it cannot be said that the relationship between plaintiff and defendant terminated after each visit. The obligation and responsibility of defendant to provide glaucoma testing extended beyond the 1981 examination of plaintiff's eyes. We conclude that defendant did not discontinue "treating or otherwise serving" plaintiff "as to the matters out of which the claim for malpractice arose" until August 18, 1983. Thus, we hold that the claim of plaintiff is not barred by the statute of limitations.[19]

Since the facts here are unique, and the Legislature has now repealed the last treatment rule as it applied to medical malpractice, we limit our holding to the facts of this case.

The judgment of the Court of Appeals is reversed, and this case is remanded to the circuit court for further proceedings.

---

[19] There is no suggestion that this plaintiff returned to COS on August 18, 1983, merely to extend the statutory period of limitations. Our decision might be different if there were evidence that such a visit had been made as a mere artifice to extend the limitations period.

RILEY, C.J., and LEVIN, BRICKLEY, CAVANAGH, BOYLE, and ARCHER, JJ., concurred with GRIFFIN, J.